## ZIMMERMAN v. UNITED STATES.

No. 12275.

United States Court of Appeals Fifth Circuit.

Jan. 18, 1949.

Rehearing Denied Feb. 21, 1949.

Coleman Gay and Henry H. Brooks, both of Austin, Tex., for appellant.

Henry W. Moursund, U. S. Atty., of San Antonio, Tex., and Frank H. Hunter, Asst. U. S. Atty., of El Paso, Tex., for appellee.

Before HUTCHESON, SIBLEY, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

The appeal is from a conviction by the court, jury trial having been waived, on seven counts of an indictment which charged R. L. Slaughter and George F. Zimmerman with devising a scheme to defraud and making seven uses of the mail in executing and attempting to execute it on Dec. 31, 1943, and on Jan. 4 and 5, 1944. Slaughter having died, Zimmerman alone was tried. The errors specified all go to the sufficiency of the evidence to show the

scheme and Zimmerman's participation in it, save one touching the admission of testimony of the conduct and statements of R. L. Slaughter, business partner of Zimmerman, which tended to show that Slaughter was carrying on such a scheme as was alleged. The objection was that Slaughter's conduct was not admissible against Zimmerman unless Zimmerman was a conscious promoter of the criminality of Slaughter. The court thought the objection probably good, but on the district attorney's promise to show a situation where the acts of one would be the acts of all the court ruled, "I will carry the objection along and see just what happened." No further ruling seems to have been made. We think, however, that the case as fully developed later would justify the consideration of the evidence, if it was considered, so that no error is shown.

The scheme alleged, much abbreviated, is that Zimmerman and Slaughter, doing business as partners under the name of Brown Brothers, between January 1, 1936 and November 1, 1944, intended to defraud customers and obtain money from them by fraudulent and false pretenses, representations and promises, in effect that the customers' money deposited with Brown Brothers would be used to purchase notes secured by mortgages, the proceeds from which would be collected by Brown Brothers and held subject to customers' demand; or would be used to make loans for the customers to be handled the same way; that all money so held by Brown Brothers would pay semi-annual interest, and that semi-annual statements would be rendered to each customer showing his cash balance subject to withdrawal; and that Brown Brothers were solvent and that money left with them constituted a sound and safe investment; all of which the accused knew to be false. The letters mentioned in the several counts as mailed Dec. 31, 1943, were such statements for the past six months and showed what the customer had at interest, what he had deposited or withdrawn, the interest earned, and what was the new balance. The letters mailed on Jan. 4 and 5, 1944, related to new deposits then made. There is no doubt the letters were mailed, and though not mailed by either Zimmerman or Slaughter, they were caused by them to be mailed through standing instructions to the office force, Zimmerman being specially in charge of the office and records, while Slaughter handled principally the active business.

The evidence touching the scheme is that Brown Brothers had been in the mortgage loan business since 1883. The original partners had been bought out by Slaughter about 1915, when he took in as a partner Zimmerman, who had been book-keeper for some time. Zimmerman was also a lawyer and rendered service about the titles. In lieu of bank credits in handling the loans which the firm made, there grew up a practice of receiving money from customers who wished to make loans or buy them, Brown Brothers paying 6% interest on the deposits till satisfactory loans were gotten. Brown Brothers would then service the loans, receiving usually 1% of the money collected. The firm had a fine reputation, and many persons having money came to use Brown Brothers as a sort of savings bank, not intending to make or buy loans, but merely to draw the semi-annual interest. This business was all done legitimately and honestly until in the 1930's the loan business fell off, interest rates on them were reduced, and the firm's annual statements, prepared by Zimmerman himself, showed a rapidly growing deficit each year. In 1938 the deficit was $47,810; in 1939, $55,884; in 1940, $71,415. Zimmerman testifies that in 1938 he realized the firm was insolvent, and pressed Slaughter to do something about it, even proposing that it be liquidated and dissolved. Slaughter insisted on going on. Slaughter died in March, 1944, and Zimmerman, though at first he wrote some customers he would continue the business, in a few days announced that it was impossible, and he and the firm were put into bankruptcy. The firm's liabilities then exceeded assets by $134,687. The customers' deposits aggregated $261,732. Two ten percent dividends only have been paid them. Slaughter owed the firm over $171,000, and Zimmerman over $49,000. Zimmerman's estate in bankruptcy repaid the greater part of his account. During this period of insolvency the methods of doing business had not changed. There was

no advertising for deposits, but new money was continually received. One depositor had over $50,000 due her. There were 73 depositors including three small accounts of Zimmerman's wife and children. Slaughter did the receiving of money in the last years, and encouraged some to deposit right up to the time of his death. Zimmerman did not receive any deposits after 1939, and even suggested other use of their money to several would-be depositors, but did not tell them of the firm's condition. During all this time there was a single bank account of the firm into which all monies received went. The partners had no separate bank accounts, but drew on the firm's bank account for what they needed for household and other expenses, and charged it to their several accounts. Zimmerman drew about ten thousand dollars for an oil well venture, but he paid in about $7,000 earned on the outside as a lawyer during the last six years.

We are of opinion that while the firm's business was fair and honest and its good reputation deserved prior to 1938, the situation changed then. Both partners knew a progressive insolvency existed. So long as there was a reasonable hope of rescuing the business a fraudulent intent would not usually be inferred from its continuance. But things got worse and worse, so that Zimmerman no longer had hope and proposed liquidation. This is to his credit, but instead of insisting, as he had the right to have done, he acquiesced in Slaughter's determination to continue. Zimmerman did not himself thereafter receive any deposits, which again is creditable, but he acquiesced in Slaughter's doing so, and must as the office man have known of each such deposit. Whether or not he knew of the exact things that Slaughter was doing and saying, he knew that the deposits were being made on the faith of the reputation and past record of the firm, and as office man he did his part in booking them and sending out the semi-annual statements and paying the interest, which were all necessary to keep things going and to prevent "a run on the bank." Moreover, he as a partner shared in the benefit of every such act of Slaughter's and was actually drawing out of the firm's money, which included these deposits, his own living all the while. The conclusion is warranted that he was consciously aiding and abetting what Slaughter was actively doing. They were both knowingly deceiving their deposit customers. Even if no positive misrepresentations and promises were made as charged in the indictment, still the continuance of the business, the payment of interest, the sending out of statements as before, with concealment of the known insolvency, constituted a false pretense, also charged in the indictment, that the firm's affairs were as they had been in the past. It is well understood, and embodied in many criminal statutes, that for bank officials to receive deposits after knowledge of the bank's insolvency is a rank fraud. Brown Brothers were doing just that, though not a bank. Title to money or checks so deposited did not, because of the fraud, really pass to Brown Brothers, but could have been recovered so long as identifiable. So also it is well settled that goods ordered by one who knows he is insolvent and who does not intend to pay, may be recovered because of fraud so long as they can be identified. If these partners began using and intending to use the good reputation of Brown Brothers to continue to obtain money from depositors, knowing of their insolvency and that the depositors would eventually lose some if not all of their deposits, there was born a scheme to defraud. The evidence warrants such a conclusion, regardless of special representations made in some instances by Slaughter.

What has been said sufficiently argues that the semi-annual statements mailed Dec. 31, 1943, were in execution of the scheme which was still in operation. The letters of Jan. 4 and 5, 1944, had direct reference to new deposits. The letters, though not mailed by either partner, were caused to be mailed by both under the circumstances. The conviction was warranted. The comparatively light sentences show that account was taken of the mitigating circumstances as to Zimmerman.

The judgment is affirmed.