**UNITED STATES of America**

v.

**Leonid TANKEL and General Parcel & Travel Co., Inc., Defendants.**

**Crim. No. 10515.**

United States District Court
D. Connecticut.

Aug. 23, 1963.

Robert C. Zampano, U. S. Atty., Arnold Markle, Asst. U. S. Atty., New Haven, Conn., for United States.

Henry K. Chapman, New York City, for defendants.

ANDERSON, Chief Judge.

*Findings of Fact:*

1. During the period 1957 through 1961 and for several years prior thereto, the defendant Leonid Tankel controlled and operated a corporation known as General Stamp Company.

2. On August 1, 1957, the defendant General Parcel and Travel Co., Inc. was incorporated and organized under the laws of the State of New York. Its officers were Leonid Tankel, Mrs. Leonid Tankel, and Mrs. Nat Birman, daughter of the Tankels. General Stamp Company owned the stock of General Parcel and Travel Co., Inc. (hereinafter referred to as General Parcel), and Tankel owned the stock of General Stamp Company. Thus General Parcel was actually owned, controlled and operated by the defendant, Leonid Tankel.

3. The principal purpose of General Parcel was the shipment of gift parcels of clothing, food and other merchandise from customers in the United States to addressees in the Soviet Union.

4. Tankel, as General Parcel & Travel Company, on March 30, 1957, had entered into an agreement with Intourist, an official agency of the government of the Soviet Union, which provided for the method of shipping parcels, the collecting and remitting of customs duties and other charges, and the penalties if Tankel failed to comply. This agreement was adopted by General Parcel and later, on October 29, 1959, a substitute agreement covering substantially the same subject matter was entered into between Intourist and General Parcel.

5. The purpose of the agreements was to expedite the customs clearance and forwarding in the U.S.S.R. of packages sent by General Parcel. The agreements provided that General Parcel, acting as agent for the individual senders of gift packages, would pay to Intourist the customs duty and Intourist's commissions due on packages forwarded to addressees in the U.S.S.R. by General Parcel. Intourist, for its part, authorized General

Parcel to issue a U.S.S.R. customs license for each package and undertook to expedite customs clearance in the U.S.S.R. The payments to Intourist were to be made by the 10th of each month, but Intourist later required that they be made by wire by the same date.

6. The main office of General Parcel was at 135 West 14th Street in New York City. Between the organization of the company and April 1, 1961 there were established approximately 12 branches, each in different cities of the United States.

7. The processing of parcels and the handling of and accounting for money between the branches and the main office and between the main office and Intourist were carried on as follows: On receipt of a parcel, employees in the branch office prepared a work sheet specifying the contents and weight of the parcel, the cost of each of the items in it, the U.S.S.R. customs duties, the Intourist fee, General Parcel's service charge, United States Parcel Post fee, and the insurance charge. The customer, on payment of the foregoing charges, received one copy of the work sheet as a receipt; three copies, along with a check covering the full amount of the customs duties and Intourist's fee and one-half the amount of the service charge and insurance cost, were forwarded to the main office. The main office deposited the total amount of the check to the account of General Parcel. If the charges were correct and the items proposed for enclosure were proper, it also prepared the original customs license, for enclosure within the parcel, the printed label with the recipient's name on it, the pink return-receipt card to be signed by the addressee and the necessary customs forms and declarations, all of which were sent to the branch. On receipt of these forms and documents the branch office entered the transaction in the branch office mailing book, insured the parcel and mailed it to the U.S.S.R. At the end of each month the main office prepared and forwarded to Intourist a report listing the number of licenses issued and the amounts, collected from customers, due Intourist. On or before the tenth day of the next month, the bookkeeper in the main office drew a check against the funds in General Parcel's account, had it certified by the company's depository bank, and personally delivered the certified check, payable to "the credit of Intourist, State Bank of Moscow", to the Chase-Manhatten Bank, which wired the funds to the U.S.S.R..

8. The work sheets from the branch offices and their checks in payment for the charges due were mailed from the branch offices to the main office and were carried by United States mail; and the licenses and other documents were returned from the main office to the branch offices by United States mail.

9. This regular procedure of handling parcels, customs and other documents, and payments and accounts was followed until March or April of 1959.

10. In March or April of 1959, on instructions by Tankel, the bookkeeper of General Parcel, who received and entered the payments to General Parcel from its branches, changed the system of handling these payments. Thereafter, on receipt of the branch offices' checks, the bookkeeper sent large checks, i. e. those for about $200 or more, to the defendant Tankel to be dealt with by him. Payments in lesser amounts were deposited in General Parcel's account, as before.

11. When the 10th of the following month approached, Tankel paid a portion of what he had thus received into General Parcel's account. His deposit, plus the small payments from the branches which had been deposited directly, governed the amount which General Parcel could pay to Intourist.

12. At about the same time, i. e. March or April of 1959, there was not enough in General Parcel's account to pay for the customs duties and other charges for all of the parcels which it had contracted to ship and for which it had actually been paid during the preceding month, and Tankel, therefore, caused General Parcel to report to Intourist only that portion of the number of licenses issued which would be covered

by the accompanying payment, even though the defendants knew the parcels containing licenses had been mailed ·to Russia. The licenses issued but not reported for that month were included in the licenses reported for the next succeeding month. But licenses which should have been reported for that next month went undisclosed until the month following.

13. This unusual method of handling the branch office payments and of deferring the reporting of some of the licenses issued continued under Tankel's instructions through 1959 and the first half of 1960 at a fairly constant monthly figure of 250 or 300 licenses. Between the middle of 1960 and the end of January, 1961, the number of licenses issued but unreported became cumulative month after month and increased to approximately 5000 by the end of that period.

14. Licenses were designated as belonging to a particular year by letters "A" for 1957, "B" for 1958, "C" for 1959, "D" for 1960 and "E" for ·1961. To cover arrearages the defendants issued about 1000 licenses between December 10th and 31st, 1960, designated by the letter "E" instead of by "D" as they should have been.

15. Toward the end of the calendar year, 1960, Intourist and the Russian Government discovered that neither General Parcel nor Tankel had remitted all of the customs duties and other charges which had been paid by the customers and which had been forwarded to General Parcel by the branch offices for the parcels mailed.

16. After these practices were discovered, the number of licenses issued but not reported, between February, 1961, and the termination of General Parcel & Travel Company's business in October, 1961, leveled off to approximately 150 per month.

17. From time to time Tankel withdrew or withheld funds from General Parcel's treasury for his own individual use. These withdrawals were invested by Tankel in various business enterprises.

18. As their credit standing deteriorated, the defendants, to avoid the delay involved in clearing checks of General Parcel, paid a 1% service charge to various third parties for endorsing and cashing checks for him, which charge was not entered on the books of General Parcel.

19. Between October and December, 1959, Tankel entered into a venture of importing food products from Russia. Through the General Stamp Company he purchased $52,000 of these products and paid for thousands of dollars in warehouse charges with money taken from General Parcel.

20. Between July and November, 1960, Tankel expended about $80,000 in purchasing stamps. $70,000 of this money was taken from funds of General Parcel.

21. Both the food and stamp ventures resulted in substantial losses.

22. Because of these activities by Tankel, his indebtedness to General Parcel and General Parcel's indebtedness to Intourist at the ends of the fiscal years, 1959, 1960 and 1961, were as follows:

|  | Tankel to General Parcel | General Parcel to Intourist |
|---|---|---|
| 6/30/59 | $ 93,854.90 | $ 94,103.83 |
| 6/30/60 | 184,543.13 | 177,256.26 |
| 6/30/61 | 224,004.34 | 218,875.94 |

23. At the end of January, 1961, the defendant General Parcel owed Intourist $201,712.73. Of this indebtedness approximately $158,000 was the total of the monies diverted from the treasury of General Parcel by Tankel for personal business ventures of his own. This is referred to as the "old debt".

24. From early January, 1961, to September, 1961, the defendants by telegrams, letters, and conferences with Russian and Intourist officials sought grace periods to restore the funds which had been diverted to Tankel's other enterprises. These efforts included trips by Tankel to Russia, one in January and another in August of 1961.

25. The defendant Tankel went to the Headquarters of Moscow-Intourist in Russia on January 6 and 7, 1961. Tankel advised Intourist that the defendants were behind in their account with it and asked for a grace period within which to pay the old debt, with the understanding that they would, meanwhile, keep new business obligations currently paid. Intourist granted the defendants a grace period of 10 months during which they were to pay at least $10,000 per month on the old debt. The defendants asked Intourist to apply, as the initial three months payments, the $30,000 which defendants had deposited as a guarantee fund with Moscow-Intourist when General Parcel received its franchise to ship parcels to the U.S.S.R. Moscow-Intourist, however, at no time agreed to this and did not take this deposit for credit against the defendants' indebtedness until October, 1961, when General Parcel's franchise was cancelled.

26. Between January, 1961, and the middle of June, 1961, General Parcel remitted to Intourist each month sums which were the approximate equivalent of the business reported to Intourist for the months for which the sums were due. This, however, makes no allowance for the licenses issued but unreported until the next month during this period.

27. On January 31, 1961, General Parcel owed Intourist $201,712.73, exclusive, however, of the amounts due on shipments for which the licenses had been arbitrarily omitted from the monthly report to Intourist. This sum of $201,-712.73 includes, however, the old debt of approximately $158,000 due at the end of 1960 and takes account of the sum of $33,785.99 paid by General Parcel to Intourist in January, 1961.

28. On February 15, 1961, the sum of $11,306.99 was paid on account of the old debt, reducing it to approximately $146,000.

29. In connection with current business General Parcel paid to Intourist $48,223.06 on February 14, 1961; but at the end of February, 1961, General Parcel owed Intourist $211,797.45, which includes the outstanding portion of the old debt but again excludes the amounts due on shipments for which the licenses had been arbitrarily omitted from the monthly report to Intourist.

30. Although in March, 1961, General Parcel paid Intourist $90,832.40, on March 31, 1961 General Parcel owed Intourist $189,880.76, which includes the outstanding portion of the old debt but excludes the amounts paid by customers on parcels for which the licenses had been arbitrarily omitted from the monthly report to Intourist.

31. In April, General Parcel paid Intourist $68,915.75 and there was due from General Parcel to Intourist on April 30, 1961, $195,477.20, which includes the outstanding portion of the old debt but excludes the amounts paid by customers on parcels for which the licenses had been arbitrarily omitted from the monthly report to Intourist.

32. In May, 1961, General Parcel paid Intourist $53,019.00 but on May 31, 1961 there remained due from General Parcel $207,310.35, which includes the outstanding portion of the old debt but excludes the amounts paid by customers on parcels for which the licenses had been issued but arbitrarily omitted from the monthly report to Intourist.

33. In June, 1961, General Parcel paid Intourist $54,852.34 but on June 30, 1961, General Parcel owed Intourist $218,875.94, which includes the outstanding portion of the old debt but excludes the amounts paid by customers on parcels for which the licenses had been issued but arbitrarily omitted by Tankel from the monthly report to Intourist.

34. The amounts paid by General Parcel to Intourist each month, as aforesaid, are claimed by the defendants as payments of the current obligations for the next preceding month, and, as far as the totals paid from February 1 to about June 15, 1961 are concerned, the total paid roughly approximated the total current payments due for the shipments reported in the monthly reports by General Parcel to Intourist for January through

May, 1961. This, however, takes no account of the licenses which were arbitrarily omitted from the report to Intourist. The defendants, however, failed to fulfill the conditions of the grace period given them by Intourist in January, 1961, and to make the payments which were a part of those conditions. Because of this failure, the defendants' grace period was shortened in March, 1961, to 4 months, but they could not and did not carry out this payment schedule either. Therefore, Intourist first applied all sums received by it from the defendants to the obligations past due and the current payments became badly in arrears. The defendants were also required to pay penalties and incurred other expenses which worsened the situation.

35. As of June 30, 1961, when General Parcel owed Intourist $218,875.94, the defendant Tankel owed General Parcel $224,004.34. At this time neither defendant had assets with which to defray the obligations.

36. As a consequence of the application by Intourist of defendants' payment to past due obligations, the money paid by customers for customs duties on their parcels was not paid into the hands of the Russian customs officials. They, therefore, refused to accept the parcels and returned them to the United States where they were held by the United States Post Office until the return postage of approximately $10 per parcel was paid.

37. For this reason in March, April and May, 1961, parcels began to reappear at Post Offices in some of the cities where branches were located. In June returned parcels began to appear in large quantities at the Morgan Annex of the United States Post Office in New York. Between June 8 and June 26, 1961, 560 parcels were returned. In succeeding weeks returned parcels came back from Russia in a continuing flood, both to the branches and to the main office of General Parcel so that by early September, 1961, they totaled about 8,000 parcels.

38. The returned parcels which came to General Parcel's main office in June and July of 1961 had originally been mailed in March and April, 1961.

39. The defendants were fully aware that Moscow-Intourist intended to hold them strictly to the conditions of the grace periods granted in January and March, 1961, and, upon their failure to fulfill these conditions, they had full knowledge that monies sent would not be applied to customs duties and other charges on currently shipped parcels but would be applied to past due obligations.

40. As early as February 17, 1961, defendants were advised that parcels would not be cleared unless the debt due Intourist was paid, and the defendants were requested to discontinue issuing licenses as of February 20, 1961.

41. On May 23, 1961, Moscow-Intourist telegraphed General Parcel advising the latter that money paid in April was being applied to the past due obligations, that licenses issued in April were not paid for and that the customs officials would not let the parcels into Russia. Intourist demanded payment of $50,000 by June 1, 1961, plus $25,000 as an advance payment on June shipments, sums which the defendants did not and could not pay. On May 24, 1961, Moscow-Intourist telegraphed General Parcel that parcels were being returned because of lack of funds with which to pay duties on the parcels.

42. On May 26, 1961, Moscow-Intourist telegraphed General Parcel that it could not stop the return of packages because they were being sent back by the customs officials for non-payment of duty. Intourist requested that the defendants do not reship the parcels until the accounting between them was finally straightened out.

43. On June 14, 1961 Moscow-Intourist telegraphed General Parcel acknowledging receipt of $20,000 and advising that it was awaiting additional payments. Meanwhile, defendants sought a further grace period for payment and begged that parcels not be returned to the United States. On June 16, 1961, Moscow-Intourist, replying to defendants' requests.

simply stated that it did not have funds of General Parcel to pay the duty and said it was urgent that General Parcel and Travel Company send the money.

44. After the returned parcels began to be received at the New York post office from Russia, each one marked that it was returned for non-payment of customs duties, and after the defendants were required to pay approximately $10 per parcel to redeem them from the United States Post Office, defendants decided not to forward currently received funds for customs duties and other charges to Intourist on the theory that the duty had been currently paid for parcels sent in the preceding 5 months and that, with the parcels being returned, defendants were entitled to a credit for the customs duty and other charges which they claim already to have paid. But as the payments were being used by Intourist on past due obligations no such credit existed.

45. On or about May 20, 1961, Mr. Iwan Naumenko of Willimantic, Connecticut, at the Hartford Branch of General Parcel, arranged with the acting branch manager for the shipment of a parcel to an addressee in the Ukrain. For the shipment of said parcel, Mr. Naumenko paid U.S.S.R. Customs Duty of $57.63, Intourist Fee of $2.50, Service Charge of $11, U. S. Parcel Post Fees of $9.42 and Insurance of $1. The parcel was shipped from the United States Post Office at Hartford on June 2, 1961, containing within it Customs License #E 11027. This parcel was not admitted to U.S.S.R. but was returned to the United States. It bore affixed to it a statement that it was returned for non-payment of customs duty. It was necessary to pay the United States Post Office the sum of $10.08 as return postage to redeem said parcel.

46. On or about June 2, 1961, the defendants caused to be delivered to the Hartford Branch of General Parcel by United States mail said license, E 11027.

47. On May 20, 1961, Michael Matwijiw, for and on behalf of Olga Saleska of Hartford, Connecticut, at the Hartford Branch of General Parcel arranged with the acting branch manager for the shipment of a parcel to an addressee in the Ukrain. For the shipment of said parcel Mr. Matwijiw paid U.S.S.R. Customs Duty of $57.45, Intourist Fee of $2.50, Service Charge of $11, U. S. Parcel Post Fees of $11.67 and Insurance of $1. The parcel was shipped from the United States Post Office at Hartford on June 8, 1961, containing within it Customs License #E 11167. This parcel was not admitted to U.S.S.R. but was returned to the United States. It bore affixed to it a statement that it was returned for non-payment of customs duty. It was necessary to pay the United States Post Office the sum of $12.10 as return postage to redeem said parcel.

48. On or about June 8, 1961, the defendants caused to be delivered to the Hartford Branch of General Parcel by United States mail said license, E 11167.

49. On May 20, 1961, Mrs. Alla Hamisevich of New Britain, Connecticut, at the Hartford Branch of General Parcel, arranged with the acting branch manager for the shipment of a parcel to an addressee in the Ukrain. For the shipment of said parcel, Mrs. Hamisevich paid U.S.S.R. Customs Duty of $53.96, Intourist Fee of $2.50, Service Charge of $11, U. S. Parcel Post Fees of $11.67 and Insurance of $1. The parcel was shipped from the United States Post Office at Hartford on June 5, 1961, containing within it Custom License #E 11169. This parcel was not admitted to U.S.S.R. but was returned to the United States. It bore affixed to it a statement that it was returned for non-payment of customs duty.

50. On or about June 5, 1961, the defendants caused to be delivered to the Hartford Branch of General Parcel by United States mail said license, E 11169.

51. On May 22, 1961, Mrs. Helen Elman of Cambridge, Massachusetts, (now Mrs. Helen Guido), at the Hartford Branch of General Parcel, arranged with the acting branch manager for the ship-

ment of a parcel to an addressee in the U.S.S.R. For the shipment of said parcel, Mrs. Elman paid U.S.S.R. Customs Duty of $25.95, Intourist Fee of $2.50, Service Charge of $11, U. S. Parcel Post Fees of $11.30 and Insurance of $1. The parcel was shipped from the United States Post Office at Hartford on June 8, 1961, containing within it Custom License #E 11448. This parcel was not admitted to U.S.S.R. but was returned to the United States. It bore affixed to it a statement that it was returned for non-payment of customs duty. It was necessary to pay the United States Post Office the sum of $11.60 as return postage to redeem said parcel.

52. On or about June 8, 1961, the defendants caused to be delivered to the Hartford Branch of General Parcel by United States mail said license, E 11448.

53. On May 31, 1961, Mrs. Theodora Maksymiw of Ludlow, Massachusetts, at the Hartford Branch of General Parcel, arranged with the acting branch manager for the shipment of a parcel to an addressee in the Ukrain. For the shipment of said parcel, Mrs. Maksymiw paid U.S.S.R. Customs Duty of $23, Intourist Fee of $2.50, Service Charge of $8.50, U. S. Parcel Post Fees of $5.22 and Insurance of $1. The parcel was shipped from the United States Post Office at Hartford on June 9, 1961, containing within it Custom License #E 11585. This parcel was not admitted to U.S.S.R. but was returned to the United States. It bore affixed to it a statement that it was returned for non-payment of customs duty. It was necessary to pay the United States Post Office the sum of $6.10 as return postage to redeem said parcel.

54. On or about June 9, 1961, the defendants caused to be delivered to the Hartford Branch of General Parcel by United States mail said license, E 11585.

55. On June 2, 1961, Mrs. Mary Papa of Springfield, Massachusetts, at the Hartford Branch of General Parcel, arranged with the acting branch manager for the shipment of a parcel to an addressee in the Ukrain. For the shipment of said parcel, Mrs. Papa paid U.S.S.R.

Customs Duty of $26.20, Intourist Fee of $2.50, Service Charge of $11, U. S. Parcel Post Fees of $8.55 and Insurance of $1. The parcel was shipped from the United States Post Office at Hartford on June 9, 1961, containing within it Custom License #E 11586. This parcel was not admitted to U.S.S.R. but was returned to the United States. It bore affixed to it a statement that it was returned for non-payment of customs duty. It was necessary to pay the United States Post Office the sum of $8.60 as return postage to redeem said parcel.

56. On or about June 9, 1961, the defendants caused to be delivered to the Hartford Branch of General Parcel by United States mail said license, E 11586.

57. On June 19, 1961, Mrs. Katerina Daum of Hartford, Connecticut, at the Hartford Branch of General Parcel, arranged with the acting branch manager for the shipment of a parcel to an addressee in the Ukrain. For the shipment of said parcel, Mrs. Daum paid U.S.S.R. Customs Duty of $16.17, Intourist Fee of $2.50, Service Charge of $8.50, U. S. Parcel Post Fees of $3.80 and Insurance of $1. The parcel was shipped from the United States Post Office at Hartford on June 26, 1961, containing within it Custom License #E 12728. This parcel was not admitted to U.S.S.R. but was returned to the United States. It bore affixed to it a statement that it was returned for non-payment of customs duty. It was necessary to pay the United States Post Office the sum of $3.57 as return postage to redeem said parcel.

58. On or about June 26, 1961, the defendants caused to be delivered to the Hartford Branch of General Parcel by United States mail said license, E 12728.

59. The sums paid by the customers above mentioned for customs duties were forwarded by United States mail by the Hartford branch by its checks to General Parcel's main office at New York. The checks which included these payments were #604, dated June 12, 1961, #595, dated June 2, 1961, and #629 dated July 3, 1961. They were cashed by Tankel via S. & S. Construction Co. and

the proceeds were used at the direction of Tankel.

60. The sums remitted from the Hartford Branch in June and July were not used by the defendants to pay customs duties on parcels shipped from that branch during those months but were used in part for the reshipment of parcels originally mailed in March and April and which had been returned to the United States for non-payment of customs duties, as well as for return postage, past due obligations to Intourist and other expenses of General Parcel.

61. The defendants knew that the money so received by them could not and would not be used to pay the customs duties for the several parcels of the customers.

62. All of the parcels sent by said customers were in fact not delivered to their respective addressees in U.S.S.R. but were returned by customs officers of U.S.S.R. to the United States because the customs duties payable on them had not been paid.

63. None of said customers received any refund or restitution of the payment he made for U.S.S.R. customs duties and other charges because of the non-delivery and return of his parcel.

64. The worksheet form furnished by the defendants, a copy of which constituted a receipt to each of the above named customers, was used by the Hartford Branch Office at the direction of the defendants. The receipt represented to each customer that General Parcel " * * in good faith, and in accordance with its arrangements with Intourist, Ltd., undertakes to ship the above merchandise to the addressee shown * * * "

65. Had the acting manager of the Hartford Branch known that the money which he received from the above named customers for the payment of customs duty on their several parcels would not be used for that purpose but would be diverted for other purposes, he would not have entered into the arrangement for the shipment of the customers' parcels via the defendant General Parcel; nor would the customer, had he or she known that the said payments were to be used for such other purposes, have entered into the arrangements with the Branch Office of General Parcel for the shipment of his parcel.

66. At no time during the period from January 1, 1961 to August, 1961, did the defendants disclose to the acting manager of the Hartford Branch or to any of the branch managers, the fact that the defendant Tankel had diverted approximately $158,000 of the funds of General Parcel to other business ventures of his own or that by the 1st of June, 1961, the defendants were in dire financial straits or that Intourist was insisting on the payment of past due obligations and upon the defendants' failure to pay acceptable installments under the terms of the grace periods given the defendants, Intourist was applying current payments first to past due obligations and that, absent sufficient funds to pay up these past due obligations and current amounts due, parcels were being returned to the United States and would continue to be returned for nonpayment of U.S.S.R. customs duties.

67. Not only did the defendants fail to disclose the true circumstances but they took affirmative action to put off and divert inquiry by branch managers who were told, among other things, that the arbitrary withholding by the defendants of the correct number of licenses issued from the monthly report to Intourist was a mistake rather than an intentionally adopted policy; that the difficulties were caused by the branches themselves in improperly describing merchandise and collecting too little duty; that the defendants had the difficulties with Intourist fully straightened out and adjusted, when they well knew that they had not been; and General Parcel explained to several branch managers that delays in delivery were caused by a ship delivering the parcels at the wrong Russian port, which was not true.

68. Throughout the entire period the defendants represented or caused to be represented to the unorganized public

that parcels handled by General Parcel would be delivered in 6 to 8 weeks or by air-mail in 8 to 10 days and that the delivery of each parcel was 100% guaranteed.

69. Moreover, the defendants intentionally deceived customers, branch managers and Intourist in the arbitrary withholding of the correct number of licenses issued from month to month; they post-dated licenses and deceived Intourist on the monthly reports of the number of licenses issued; and, after the arrears in payment to Intourist had been discovered by Intourist, they attempted to explain it by representing that it was caused by the failure of branch managers to remit from the branches sums due, which was not true.

70. The purpose behind the defendants' activities during 1961 was to conceal, as long as possible and from as many interested parties as possible, the fact that by the end of the year 1960 $158,000 of the funds of the defendant General Parcel had been withdrawn or withheld from the treasury of the Company and had been diverted to personal business ventures of the defendant Tankel. These efforts were also designed to provide sufficient time and to acquire sufficient means to cover the diversion of these funds.

71. The scheme to effectuate this consisted of the tampering with the licenses, both in numbers and dates, the falsification of the reports to Intourist, the efforts to keep from customers and the branch managers and from those who loaned the defendants money the facts of the financial condition of both the defendants, and the refusal to disclose truthfully why there was a discrepancy between dates and symbols on licenses and dates of shipment of parcels and why parcels were being returned. There were, in addition, innumerable false statements and fraudulent misrepresentations to the branch managers, lenders and Intourist.

72. On August 14, 1961, the defendant Tankel again went to Moscow to seek a further grace period within which to take care of defendants' obligations. As a result of this, the defendants were granted a further grace period for continuing the business, provided they immediately remitted $40,000 and paid certain regular current payments thereafter.

73. The defendants failed to fulfill the conditions of the extension granted to them on August 14, 1961; and on September 2, 1961, Intourist advised General Parcel that a part of the parcels still held in Russia were being returned to the United States.

74. On September 9, 1961, Moscow-Intourist advised General Parcel to ship no more parcels until the past due obligations were paid. Then, on October 11, 1961, Intourist finally cancelled the contract with General Parcel.

75. During this period from September 9th to several days after October 11, 1961, the defendants continued the business and continued to receive payments intended to be used for payment of customs duty on parcels being currently shipped, and at no time did they advise any of the branch officers or customers of the defendants' financial condition or of the probability of non-delivery of parcels or of the diversion of current customs duty payments to payment of past due obligations or that on or after September 9, 1961, parcels received would not be shipped and that the customs duties paid would be diverted to other uses.

76. The money sent in, in the closing weeks, from the branches for customs and other charges was actually used in part to pay for reshipment of some returned parcels, for office rent, payroll and other expenses of General Parcel.

77. On or about October 17, 1961 General Parcel, under pressure from branch managers and creditors, ceased to do business.

*Discussion*

In 1958 and early 1959 General Parcel was apparently a solvent and fairly prosperous concern. In late 1959 and in 1960 the defendant Tankel, who was the actual owner of General Parcel, took various

sums from the treasury of General Parcel which he used for other business ventures of his own. These ventures resulted in serious financial losses so that the defendant Tankel was unable to restore to the treasury of General Parcel the funds taken out for other than corporate purposes. A substantial part of the money taken from General Parcel's treasury by Tankel for his disastrous ventures was money paid in by various branches of General Parcel. This money came from the payments made by customers for the shipment of their parcels and the largest item in charges made to them was for U.S.S.R. customs duties. Because the funds were not restored, General Parcel fell behind in its monthly payments to Intourist which were supposed to be paid to cover customs duties and charges for the next preceding month so that at the end of the year 1960 General Parcel owed Intourist about $158,-000. The story of the activities of the defendants which ensued over the period from January 1, 1961 to the middle of October, 1961, is an account of the strenuous and desperate efforts by the defendants to escape the direct consequences of the diversion of funds from General Parcel. The scheme adopted by the defendants was to conceal from Intourist, branch managers, employees, customers, lenders and anyone else in interest, as much of the truth of the defendants' dire financial condition as possible for as long as possible, for both the immediate purpose of gaining grace periods from Intourist to make up the deficiencies and to keep money flowing in from the branches and their customers as well as to facilitate the procurement of loans or credit extensions. The defendant Tankel admitted that if the true facts had been known by the branch managers or by customers, they would not have continued to do business with the defendants. In fact, as suspicions grew and some of the truth began to appear, by June and July of 1961 the business of General Parcel dropped off very rapidly. By giving false explanations for delays in deliveries of parcels and for discrepancies between dates of licenses and shipment of parcels, by concealing from the branch managers the extent of his past unpaid obligations to Intourist and by continuing his assurances to customers that there would be prompt delivery of their parcels and that promises of General Parcel would be carried out in good faith, the defendants were able to procure from the customers named in Counts 4 through 10 in the indictment, and to have paid over to one or the other of the defendants, sums of money intended by the customers and the acting branch manager at Hartford, Connecticut, for the payment of customs duties on their parcels. The defendants were fully aware that the customers and the acting branch manager had paid over the money to them for this purpose and in conformity with this had issued a license. The defendants, however, received the money knowing that neither directly or indirectly could or would the money paid be used for the intended purpose of defraying the U.S.S.R. customs duties on the customers' parcels for which licenses were issued and of which shipment was made, but instead would be used to make up for the funds previously diverted from General Parcel. By the latter part of May, 1961, the defendants were fully aware that Moscow-Intourist would not apply current payments to current shipments unless and until their very large past obligations were paid. They may have hoped for manna from heaven or a forgiveness of the obligations due Intourist, but they had no reason to entertain such a hope and nothing to give any substance to the realization of those hopes. They had no assets or resources sufficient to discharge the debt to Intourist, and they had no prospects of getting any. To accept money from customers, via the branches, for a particular purpose knowing at the time that the purpose could not and would not be carried out constituted a fraud. As a consequence of the defendants action the parcels were not delivered to the addressees but were returned to the United States and the customers and the acting

240

branch manager thereby suffered financial damage and loss. That the United States mails were used to transmit the licenses and payment checks is not disputed. For the defendants to take money paid by their customers for the purpose of paying customs duties on parcels under the circumstances then known to the defendants but unknown to the customers and which the defendants knew were in all probability unknown to the customers was dishonest and showed a complete lack of good faith.

The defendants take the position that if there was any fraud, it was only against Intourist but go on to argue that there could not have been any fraud because the arrangement between them was in the form of a running account and it was contemplated that the debt to Intourist for customs duties and other charges would ebb and flow in the course of their monthly transactions. There is, however, not a shred of evidence to support the proposition that Intourist agreed with General Parcel on a running account arrangement in the sense of a line of credit from Intourist to General Parcel up to hundreds of thousands of dollars. The flow of payments here was from General Parcel to Intourist and the latter customarily protested even a slight delay. It had instructed General Parcel to wire the monthly remittances instead of mailing them and reprimanded the defendants for their failure to do so. This was insisted upon as one of the conditions of the grace periods but was not lived-up to by the defendants. If the defendants really thought they had a running account as they claim, why did they need to falsify the monthly reports to Intourist of licenses issued, to conceal arrears of payment; and, if there had been a running account, the defendants would have assumed that whatever they paid in would have been applied against the oldest past due items of the account, as is the usual practice, without the necessity of Intourist advising the defendants that this is what Intourist intended to do. Moreover, the defendants' duty of exercising good faith encompassed not only Intourist, but extended to the branch managers and the customers as well. The defendants did not claim to have "running accounts" with the customers. It is true that Intourist throughout the period in question evinced interest only in getting its money out of the defendants, and showed no concern whatever for the customers until the activities relating to General Parcel and its customers were adversely commented upon on the floor of the United States Senate. Thereafter steps were taken by public officials, Intourist, and others to have the remnants of General Parcel's business taken over by a specially formed corporation called Atlas Parcel Corporation, which also reshipped the balance of the returned parcels.

The proof of several charges alleged in the indictment bring the case within the prohibition of the Statute, Title 18 U.S.C. § 1341. Pereira v. U. S., 347 U.S. 1, 8, 74 S.Ct. 358, 98 L.Ed. 435 (1954); United States v. Kyle, 257 F.2d 559, 564 (2d Cir. 1958); Gregory v. U. S., 253 F.2d 104, 109 (5th Cir. 1958); Zimmerman v. U. S., 171 F.2d 790, 792 (5th Cir. 1949) cert. denied 337 U.S. 941, 69 S.Ct. 1513, 93 L.Ed. 1746; Knickerbocker Merchandising v. U. S., 13 F.2d 544, 546 (2d Cir. 1926) cert. denied 273 U.S. 729, 47 S.Ct. 239, 71 L.Ed. 862.

To give the defendants the full benefits of any inconclusiveness of proof or variances between allegations of the particular counts of the indictment and the proof, defendants are found *not guilty* on Counts 1, 2, 3, 11, 12, 13 and 14.

The defendants are each found *guilty* as charged on each and all of Counts 4, 5, 6, 7, 8, 9, 10, 15 and 16 of the Indictment.